## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| | ) |
| | ) |
| **v.** | ) No. 16-40025-TSH |
| | ) |
| CARLOS JIMENEZ | ) |
| | ) |
| | ) |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS
## MOTION TO SUPPRESS EVIDENCE

Defendant Carlos Jimenez, by and through undersigned counsel, hereby submits this Memorandum of Law in support of his Motion requesting that this Honorable Court enter an order suppressing all statements and physical evidence derived from his vehicle stop by the Massachusetts State Police in Sturbridge, Massachusetts, on October 4, 2013, obtained in violation of the Fourth and Sixth Amendments to the United States Constitution.

As set forth more fully below, police pulled Jimenez and his passenger over on a pretextual marked lanes violation and then extended the stop to interrogate both occupants of his vehicle based on less than reasonable suspicion of their involvement in the heroin trade, contrary to the holding of *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). The conditions of Jimenez's detention and interrogation exceeded a legitimate stop, such that he should have been afforded the protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), and the resulting search lacked either valid consent or probable cause. All evidentiary fruits of the stop, including physical evidence and statements, should be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487-488 (1963).

Moreover, the identification of Jimenez by the witness CW in a subsequent suggestive single-photo presentation was unfair and unreliable and should also be suppressed pursuant to the Due Process clause of the Fifth Amendment to the United States Constitution.   Jimenez requests a hearing on this motion.

## BACKGROUND

On October 4, 2013 the Drug Enforcement Administration ("DEA") was involved in an undercover controlled buy operation targeting a garage in Leominster, MA owned by the target of the investigation, a street-level heroin dealer known as "CW."[1]   A1.   The DEA's confidential informant, wearing a recording device, attempted to purchase heroin from CW at the garage just after noon; CW told him that the drugs were still on their way and would not be ready until after 1:30 p.m.   A1-2.   The confidential information overheard CW giving someone directions to the garage over the phone.   A11.   At the same time, CW's Chevrolet, which the DEA had observed parked at the garage at 10:00 that morning, was no longer there.   A11.   The Chevrolet returned, driven by an unknown person, shortly after 12:30 p.m.   A12.   At times unknown between just after 12:00 p.m. when the initial controlled buy was allegedly attempted and approximately 2:45 p.m. when the confidential informant allegedly made the purchase (and while the recording device was disabled), the confidential information made and received a series of phone calls to an individual identified in the reports as M.R.   A2, A13.   M.R. allegedly advised the confidential informant that the drugs were being prepared and would be ready in 15 to 20 minutes.   A2.   The confidential informant returned to the garage and purchased $7,500 worth of heroin from CW in a recorded meeting at approximately 2:45 p.m.   A2-3.

---

[1] References to the enclosed Appendix are by page number and preceded with "A."

After the confidential informant left the garage, but before CW's Chevrolet driven by an unknown male parked in the garage, a Lexus bearing New Jersey plates parked inside the garage. A12.  The report contains no description of the individuals inside the Lexus before it entered the garage, and nothing that happened inside the garage could be observed by investigators while it was parked there.  *Id.*  All told, the Lexus had been parked at the garage for about two hours between 12 p.m. and 2 p.m.  *Id.*  When it left, the Lexus was occupied by "two dark skinned Spanish males."  The DEA assigned Trooper Jaime Vitale to follow it onto I-190 South.  *Id.*  Trooper Vitale then spoke with Trooper David DiCrescenzo by telephone on an apparently unrecorded line.  A47.  During this conversation, Trooper Vitale told Trooper DiCrescenzo that he was following a Lexus, he provided Trooper DiCrescenzo with the Lexus' plate number, and advised that he believed the Lexus was about to be travelling on Route 84.  *Id.*  Trooper Vitale then told Trooper DiCrescenzo that he believed the Lexus was "carrying drugs or cash or both." There is no record, or indication, he explain the basis for this belief.  *Id.*  Nonetheless, he asked Trooper DiCrescenzo to stop the vehicle but advised Trooper DiCrescenzo "would have to establish his own basis for the stop, and any subsequent search of the vehicle unless consent was obtained."  *Id.*  An hour after Trooper Vitale began following the Lexus, Trooper David DiCrescenzo pulled the Lexus over on Route 84 in Sturbridge, Massachusetts, allegedly after witnessing an unsafe lane change.  A5.  The Lexus was driven by defendant Jimenez, a Jersey City, New Jersey firefighter with no criminal record.  A42.

The trooper questioned Jimenez about the reason for his journey, his destination, and his point of origin.  A6.  The State Police report does not mention any further contact with Trooper Vitale or any knowledge by Trooper DiCrescenzo of the DEA investigation.  Rather, it states that Trooper DiCrescenzo immediately suspected drug trafficking because the men he stopped were

nervous and because Jimenez reported having been in Lawrence for two hours visiting family.[2] A6-7.  Trooper DiCrescenzo checked the car's registration and both Jimenez and his passenger's identification; Jimenez's registration was in good order and neither man had any open warrants. A7.

Despite this, Trooper DiCrescenzo ordered Jimenez out of his vehicle and questioned him further by the side of the roadway, then placed him in the back of the patrol vehicle.  He also interrogated Jimenez's passenger with the aid of Trooper DeJesus, who spoke Spanish.  A7. Both men alluded to Jimenez's passenger being in possession of cash, and DiCrescenzo seized $44,000 and a cell phone from the passenger's black bag and two more cell phones from under the passenger seat, reportedly after obtaining Jimenez's consent to search the car.  A8-9. Trooper DiCrescenzo then permitted both men to leave in the Lexus after issuing citations for failure to signal and a marked lanes violation.  A5, 8.

A year later, in 2014, the DEA arrested CW.  He implicated Jimenez's passenger as having delivered the heroin that day.  During a jailhouse interview, the CW equivocally identified Jiminez from a single photograph, and proffered that Jimenez was aware of his passenger's purpose.  A20-21.  CW cooperated with the government and entered a guilty plea in September of 2015.  A39.  Two years after the vehicle stop, the DEA arrested Jimenez at the fire station where he worked and seized his personal iPhone; a report noted that one of the three cell phones seized at the stop was missing from the evidence room after Trooper Vitale signed them out in November of 2013.[3]  A43-47.

---

[2] It should be noted that Jimenez is of Hispanic ethnicity and the city of Lawrence has a strong Hispanic population.

[3] To date, Jimenez has been provided no discovery indicating that police have obtained a warrant (required pursuant to *Riley v. California*, 134 S.Ct. 2473, 2495 (2014)) or searched the iPhone

**ARGUMENT**

I.     **The Traffic Stop And Subsequent Search Exceeded The Bounds of The Fourth Amendment When The Trooper Continued To Interrogate Jimenez After The Purpose For The Stop Was Satisfied.**

"It is common ground that a traffic stop constitutes a seizure of both the stopped vehicle and its occupants for Fourth Amendment purposes." *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014).   "Consequently, a traffic stop must satisfy a standard of objective reasonableness." *Id.*, *citing Terry v. Ohio*, 392 U.S. 1, 19 (1968).  Trooper DiCrescenzo's report includes only that he pulled over Jimenez's Lexus after observing what he claimed was a lanes change without signaling; that he saw both men display signs of nervousness; and that he inquired further into their previous history with law enforcement followed by their journey's origin, destination, and reason.  A6-7.

     A.     **The Massachusetts State Police Did Not Have An Articulable, Objective Reason To Suspect Jimenez Of Drug Trafficking And Justify Further Detaining And Interrogating Him After Checking His License And Registration;**

The Fourth Amendment requires that law enforcement's actions during the course of the stop remain "reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation." *United States v. Ruidiaz*, 529 F.3d 25, 28-29 (1st Cir. 2008). Otherwise, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United*

---

that was seized from him at his arrest.  According to the report of the arrest, the decision was made to "process the iPhone as evidence" after "it was confirmed that the phone number 732 887 2581, [sic] was the same pertinent number related to this case in 2013."  A44.  The phone number appears nowhere else in any DEA or state police reports and Jimenez submits that any warrant issued upon these facts would also lack probable cause.  *Contrast United States v. Henry*, 827 F.3d 16, 28 (1st Cir. 2016) (probable cause to believe phones had evidentiary value in sex trafficking investigation where suspect who had previously used a phone to contact missing suspected minor sex trafficking victim said he used phones to take photographs).

*States*, 135 S. Ct. 1609, 1612 (2015) (holding that police may not extend traffic stop to conduct dog sniff absent reasonable suspicion). "An officer's inquiries into matters unrelated to the justification for the traffic stop... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Accordingly, "[a] seizure justified only by a police-observed traffic violation become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." *Rodriguez*, 135 S. Ct. at 1612.

The information known to DEA Agent John Maki and Trooper Vitale should not be imputed to Trooper DiCrescenzo for purposes of the reasonable suspicion analysis under the "collective-knowledge" or "fellow-officer" rule. "Under the 'fellow-officer' rule'... when a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge." *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997). Here, although Trooper Vitale asked for Trooper DiCrescenzo's assistance, the former expressly did not "direct" the latter to effectuate the stop. Indeed, Trooper Vitale made clear to Trooper DiCrescenzo that he would need to form *his own* basis for the stop. What is more, Trooper DiCrescenzo was explicitly told that even if there was an independent basis for the stop, a further basis must first be obtained before conducting a search. "[R]easonableness is always the touchstone of Fourth Amendment analysis." *Birchfield v. North Dakota*, 136 S.Ct. 2160, 2186 (2016). It would be unreasonable for an officer (Trooper DiCrescenzo) to premise reasonable suspicion on the collective knowledge of other officers when that officer was expressly instructed by the other officer (Trooper Vitale) not to act based on the information he was providing. Put another way,

Trooper DiCrescenzo was intentionally left without the ambit of the investigation conducted by TFO Maki; it is unreasonable to impute information known to law enforcement conducting an entirely separate investigation when those other agents purposefully chose to keep the officer conducting the stop beyond the scope of that other investigation.

Moreover, "[i]t is an unsettled question in this circuit whether, for purposes of the collective-knowledge rule, information held by one officer is necessarily imputed to the acting officer simply because they are cooperating on an investigation or part of the same agency, or whether the knowledge has to vest in either the officer who directs or carries out a police action like an arrest or a search." *United States v. Kennedy*, No. 14–CR–10191–DPW, 2015 WL 4576845, *3 (D. Mass. Jul. 30, 2015) (Woodlock, J.), *citing Meade*, 110 F.3d at 194. Specifically, the First Circuit has "expressed significant skepticism that information possessed by all individuals in a law enforcement agency or participating in an investigation can be pooled to reach" reasonable suspicion. *Kennedy*, 2015 WL 4576845, *3.  As a result, there is a serious question whether Trooper Vitale, had he effectuated the stop himself, could have had the information known to the DEA, a separate agency, imputed to him under the collective-knowledge rule.  Under these circumstances, therefore, nothing can be imputed to Trooper DiCrescenzo who is even further removed from the investigation than Trooper Vitale.  *See United States v. Winchenbach*, 197 F.3d 548, 555 (1st Cir. 1999) ("[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers *involved in the investigation*." (emphasis added)).

According to Trooper DiCrescenzo's report, instead of relying on any information supposedly provided by Trooper Vitale,[4] the reason he decided to pull over the Lexus was because he clocked its speed at 65-70 mph (the speed limit in the relevant stretch is 65 mph) as well as a marked lanes violation.[5]  A14.  In response to questioning, Jimenez allegedly stated that they had driven up early from New Jersey and had been visiting relatives in Lawrence for two hours.  It was on this basis, according to his report, that Trooper DiCrescenzo claims to have suspected the men of being drug traffickers and, despite Jimenez's license and registration coming back clean, the reason he ordered him from the car for further questioning.  A6-7.

In general, of course, "during a lawful traffic stop an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." *Brendlin v. California*, 551 U.S. 249, 258 (2007).  *But see Rodriguez*, 135 S. Ct. at 1615 (ordinary inquiries incident to traffic stop serve to ensure vehicles are being operated safely and responsibly; seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop).  The question is whether Trooper DiCrescenzo had a reasonable suspicion, after he had completed the ostensible purpose of his traffic stop by verifying Jimenez's ability to safely operate his vehicle, that Jimenez and his passenger were engaging in criminal activity, without regard to the information he learned from Trooper Vitale or information known to the DEA.

---

[4] Even viewed in the light most favorable to the government, the information allegedly provided by Trooper Vitale was insufficient to establish reasonable suspicion given that all that he is alleged to have said was that the vehicle might be carrying "cash or drugs or both."

[5] Importantly, Trooper DiCrescenzo's report does not even state he communicated with Trooper Vitale, let alone a description of the unrecorded conversation he had with Trooper Vitale over the phone.

"The Supreme Court has eschewed, emphatically, any reliance on a rigid test or formula to give the concept [of reasonable suspicion] substance. Rather, it has emphasized that the determination must be grounded in the totality of the circumstances." *United States v. Campbell*, 741 F.3d 251, 261 (1st Cir. 2013). Jimenez's response, and reference to Lawrence, did not justify his further detention and interrogation. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Similarly, while "[t]he case law makes clear that nervousness is a factor the police may consider... it alone is not sufficient. Nervousness is a natural reaction to police presence."[6] *United States v. McKoy*, 402 F. Supp. 2d 311, 317 (D. Mass. 2004), *aff'd*, 428 F.3d 38 (1st Cir. 2005). *See also United States v. Trullo*, 809 F.2d 108, 116 (1st Cir. 1987) (Bownes, J., dissenting):

> [W]e are asked to find reasonable suspicion on the basis of quite general characteristics of a sizeable area of the city, when the suspicion was not grounded in any specific information about date, time, or the particular individuals.... It would seem that, for the court, the [neighborhood] is a per se region of lessened expectation of privacy, at all times of the day and at all periods of the year, where practically unlimited deference is granted to police officers' discretion.... [T]he court ... has effectively eliminated any fourth amendment scrutiny of police suspicions concerning activity [in that part of the neighborhood].

While both of these factors can be given weight, as can suppositions formed from the officer's training and experience, something more than an officer's instincts regarding a person's

---

[6] While it is true that Trooper Vitale told Trooper DiCrescenzo that the Lexus might contain "cash or drugs or both," this information adds nothing to the reasonable suspicion analysis. First, the phrase "cash or drugs or both" is equivocal at best. Virtually all cars driving on the interstate contain cash and that information could hardly serve as a basis to effectuate a stop. Second, as set forth *infra*, none of the information known to TFO Maki or Trooper Vitale can properly be imputed to Trooper DiCrescenzo regarding the possibility of the presence of drugs or the provenance of any cash which might be found. Third, and finally, Trooper DiCrescenzo was instructed by Trooper Vitale not to conduct the stop on the basis of the information he was providing.

nervousness at his presence or his association with a particular place is required to form an objective suspicion that this person in particular was or is engaged in criminal activity. "[T]he Court has disciplined the reasonable suspicion standard by requiring some objective manifestation that the person stopped either is wanted for past criminal conduct, or is engaging or about to engage in such conduct." *Campbell*, 741 F.3d at 261. "When an officer cannot articulate suspicions concerning a particular individual, the government's interest in controlling drug trafficking by that individual is small... In fact, the government then has an interest in avoiding arbitrariness." *See United States v. Berryman*, 717 F.2d 651, 659 (1st Cir. 1983) (arrival from drug "source city" combined with allegedly unusual demeanor constituted "no articulable suspicion" and did not justify detention). Once Jimenez and his passenger's licenses were checked and the car's registration was cleared, Jimenez's nervous attitude after being pulled over for the first time ever (as he reported to the officer) and his supposedly unusual willingness to travel for family constituted nothing more than the slimmest of hunches, utterly insufficient to justify his continued seizure and interrogation by the roadway. Moreover, the suggestion that any reference to a visit to the city of Lawrence implies drug activity/involvement is an affront to that community and all its citizens.

Alternately, even if this Court considers the DEA's sighting of Jimenez's car at the site of what they believed to be a drug operation in the quantum of suspicion (as Jimenez argues it should not, *infra*), the DEA had at most a hunch that anyone parking at the garage must be involved in the drug trade they believed was occurring there. The DEA agents did not see Jimenez or his passenger transporting, storing, or selling heroin or even speaking with CW while they were parked at the garage. There is no description of the individuals in the Lexus before it parked there out of view of officers. All they saw was Jimenez's car parking and then departing

from the garage after two hours; they knew nothing else to suggest that either man had any connection to the drug activity they were investigating.  *See, e.g., Niles v. Town of Wakefield*, 172 F. Supp. 3d 429 (D. Mass. 2016) ("Merely seeing someone walking down the street in the location of a crime does not constitute an objectively reasonable, particularized basis for suspecting an individual of engaging in criminal activity.").  It ought not be forgotten that the Lexus was driven to and from an active *garage*; one would actually expect vehicles to come and go from that location even for brief periods of time.  That Jimenez's car hypothetically could have delivered heroin to CW, even combined with the Trooper's instincts, training, and experience regarding two Hispanic men in an expensive car, fails to amount to even a reasonable suspicion of wrongdoing.

> **B.**     **Because Of The Nonstandard Character Of The Traffic Stop, Jimenez Was In Custody For The Purposes Of And Should Have Been Afforded The Protections of Miranda v. Arizona;**

A routine traffic stop does not typically require *Miranda* warnings, being of a "comparatively nonthreatening" nature, as opposed to "the type of police dominated or compelling atmosphere [which necessitates the rule]."  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).  However, the conditions of the interview can escalate the stop into custody, necessitating *Miranda* warnings, "where the totality of the circumstances shows that a reasonable person would understand that he was being held to the degree associated with a formal arrest." *United States v. Fornia–Castillo*, 408 F.3d 52, 63 (1st Cir.2005), *quoting Stansbury v. California*, 511 U.S. 318, 322 (1994).  Whether "the facts of a specific case indicate a situation more akin to a routine traffic stop...[or whether] there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" depend (without limitation) on the objective assessment of four factors: "(1) "whether the suspect was questioned in familiar or at

least neutral surroundings"; (2) "the number of law enforcement officers present at the scene"; (3) "the degree of physical restraint placed upon the suspect"; and (4) "the duration and character of the interrogation." *United States v. Campbell*, 741 F.3d 251, 266 (1st Cir. 2013).

There was nothing routine or nonthreatening about the conduct of the traffic stop, which immediately commenced as an interrogation into suspected drug trafficking marked by accusatory questioning. Trooper DiCrescenzo asked nothing about the alleged marked lanes violation for which he pulled over Jimenez. After claiming to see signs of nervousness, he immediately began inquiring into when "was the last time" Jimenez had been stopped by police, where the two men had been, and how long they had been there. A6. Then, after acquiring both men's licenses and Jimenez's registration, he returned to the car and ordered Jimenez to step out to "discuss his trip and investigate potential contraband trafficking." A7. There was no suggestion of resolving the business of the stop, nor that DiCrescenzo was requesting Jimenez to leave the vehicle for any reason related to officer safety. *See United States v. Awer*, 770 F.3d 83, 90 (1st Cir. 2014), *citing Brendlin v. California*, 551 U.S. 249, 258 (2007) (officer may order passenger out of car during lawful traffic stop "as a precautionary measure" without reasonable suspicion that passenger poses a safety risk to police). That the Troopers immediately sought to separate Jimenez and his passenger so that their responses could be compared speaks both to the degree of physical control placed on the men and the character of the interrogation, which had none of the mitigating features of an ordinary traffic stop:

> Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on

his way.  In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek

*Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

Continuation of the Trooper's questioning even after Jimenez had provided a valid license and registration satisfied neither of the factors the Supreme Court pointed to in *Berkemer*. The police's obvious assumption of criminality -- remaining entirely unshaken by Jimenez's valid license and registration, clean record, and banal assertion of having been in Lawrence that day -- suggested not that he would shortly be continuing on his way after being given a citation, but that police would not stop questioning him until they had validated their suspicions that he was somehow engaged in illegal activity.  Once he was asked to leave his vehicle and warned that he was suspected of trafficking, Jimenez would not have reasonably believed that he could decline to discuss his trip further with the officer.  Thus, after any pretense of a citation for the traffic stop had concluded, Jimenez was effectively in custody for the purposes of *Miranda* and should have been read his rights.

### C.    Similarly, Jimenez's Consent To The Search Constituted Mere Acquiescence To Authority;

A search conducted pursuant to valid consent, or consent that was freely and voluntarily given, is constitutionally permissible even in the absence of a warrant or probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  However, "a simple response of 'okay' to an officer's claim of authority to search is not voluntary consent."  *United States v. Smith*, 533 F.Supp.2d 227, 232 (D. Mass. 2008) *citing United States v. Weidul*, 325 F.3d 50, 53–54 (1st Cir.2003).  *See also United States v. Chhien*, 266 F.3d 1, 7 (1st Cir. 2001) ("Consent is voluntary if it is the product of an essentially free and unconstrained choice.").  "In determining voluntariness, the focus is often on whether the individual's will has been overborne and his

capacity for self-determination critically impaired." *United States v. Rivera–Morales*, 166 F. Supp. 3d 154, 168 (D.P.R. 2015). The determination is made after considering the totality of circumstances. *Smith*, 533 F.Supp.2d. at 232.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect? We therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." *United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999). Whether consent was voluntary and not the product of "duress or coercion, express or implied...[including] an assessment of ...individualized factors [such as] age, education, experience, etc. and general considerations [such as] whether the consenting party was advised of his or her constitutional rights." *United States v. Antone*, 479 F.Supp.2d 255, 260 (D.R.I. 2007).

On the side of the highway, Trooper DiCrescenzo demanded names and addresses for the family members that Jimenez and his passenger saw in Lawrence. A7. Jimenez denied the presence of contraband in the car, but at the mention of cash, DiCrescenzo required Jimenez to sit in the back of his marked cruiser while both Troopers interrogated his passenger about the amount of money he was carrying. A7. His passenger brought out a black bag from the back seat to show the troopers one of the bundles of cash inside; when he blocked their view of the bag, they physically pushed him out of the way. A7-8. The troopers instructed the passenger to get out of the car and stand on the side of the road while DiCrescenzo returned to Jimenez and confronted him with the cash in the bag as if it validated DiCresenzo's suspicions. A8. *Compare Weidul*, 227 F.Supp.2d at 167-168 (woman whose fiance had called suicide help line

14

threatening to shoot himself did not validly consent to search despite verbal acquiescence and cooperative demeanor; she did not want police to be present and conduct of officers "bespoke a steely determination" to search regardless); *United States v. Medina*, 451 F.Supp.2d 262, 269 (D. Mass. 2006) (police's actions in walking into home conveyed to young mother with no previous experience with law enforcement that she had "no right to resist them" and invalidated consent to search).   Under the circumstances, any expression of consent given by Jimenez in his first encounter with police as he sat in the back of the cruiser accused of drug trafficking cannot be said to have been freely and voluntarily made to police.

### D.  At No Point Did The DEA Or Police Have Probable Cause To Search Jimenez's Vehicle.

"The detention of a motorist based on probable cause does not violate the Fourth Amendment's prohibition on unreasonable seizures even if an officer would not have stopped the motorist absent some additional law enforcement objective." *United States v. $572,204 in U.S. Currency, More or Less*, 606 F.Supp.2d 153, 157 (D. Mass. 2009).   Similarly, the motor vehicle exception permits the warrantless search of a motor vehicle when supported by probable cause regardless of exigency.  *United States v. Smith*, 533 F.Supp.2d 227, 232 (D. Mass. 2008), *citing Coolidge v. New Hampshire*, 403 U.S. 443, 460 (1971).

The sum of the information possessed by the DEA[7] and police was that Jimenez and his companion claimed to have been visiting relatives in Lawrence for two hours while their car was parked at an automotive garage owned by a suspected heroin dealer, and that his passenger had a

---

[7] For the sake of argument, the following analysis uses as its starting point the pool of information known to all law enforcement, including the DEA and Troopers Vitale and DiCrescenzo.  Even this pooling of information, however, is insufficient to establish probable cause.  However, as set forth *infra*, the information possessed by the DEA and/or Trooper Vitale ought not be imputed to Trooper DiCrescenzo for purposes of the Fourth Amendment analysis. To the extent that argument is credited, there is substantially less upon which probable cause may be premised than what is assumed may be considered here.

large amount of cash with him in a bag (about which he was nervous and evasive).  Simply put, this evidence did not amount to probable cause to search his vehicle.  *See United States v. One Lot of U.S. Currency Totalling $14,665*, 33 F. Supp.2d 47, 49 (D. Mass. 1998) ("The possession of cash, even in large amounts, does not create a rebuttable presumption that one is engaged in criminal activity.").  "[T]he only essential predicate for a valid warrantless search of a motor vehicle is probable cause to believe that the vehicle contains contraband or other evidence of criminal activity."  *United States v. McCoy*, 977 F.2d 706, 710 (1st Cir. 1992).  *See also United States v. Gunning*, 405 F.Supp.2d 79, 83 (D. Mass. 2005) (existence of probable cause relating to general criminal activity not sufficient to justify a warrantless search or seizure of an automobile; criminal activity must somehow be linked to motor vehicle in question).

The DEA's confidential informant had relayed from CW that the "big batch" of heroin for his purchase was being delivered through CW's source "M" from whom CW received the price of the heroin.  Detective Rodriguez's report contains that M "appeared to be relaying" information to CW on when to pick up the heroin from the garage.[8]  A2, 12-13.  TFO Maki's report contains that at 12:15 p.m., minutes before the Lexus was observed parking at the garage, CW said it was not expecting the heroin to be ready for another hour (and it was in fact not ready for another two hours) although packaging would take only 15 to 20 minutes.  A2, 11.  In other words, the police knew/observed nothing whatsoever connecting the Lexus or the $44,000 in Jimenez's passenger's bag with the $7,500 of heroin purchased from CW shortly before the time of the stop by the confidential informant.  After Jimenez and his passenger were separated and interrogated and police had searched the car, the men were held long enough for a drug dog to be

---

[8] If CW required an intermediary to tell him when the heroin would arrive, the calls giving someone directions that the confidential informant overheard CW make could not have been to the person delivering the heroin.  A11.

16

called to the stop; it alerted only to the cash in the bag.[9]   A8.   "In recent years... [courts] have questioned the probative value of positive dog alerts due to the contamination of America's paper money supply with narcotics residue... [data showed] greater than seventy-five percent of all circulated currency in Los Angeles is contaminated with the residue of cocaine or other controlled substances." *United States v. U.S. Currency*, $30,060.00, 39 F.3d 1039, 1041-42 (9th Cir. 1994) (evidence that narcotics detection dog alerted to money packaged consistent with narcotics deals that was found in claimant's automobile during traffic stop, about which he lied to officer, was insufficient to establish probable cause that money was connected to drugs as required for civil forfeiture statute).

This case can be favorably aligned with others where police's dogged pursuit of an accidental lead uncovered during the course of an otherwise unrelated drug investigation stretched beyond the bounds of the Fourth Amendment.   *See United States v. Smith*, 533 F.Supp.2d 227, 234 (D. Mass. 2008) (even where police witnessed suspected drug deal from car, because pre-raid observations did not connect contraband or evidence of a crime to car and witnessed interaction was ambiguous, pre-raid observations did not establish probable cause to search car); *United States v. Allah*, 994 F.Supp.2d 148, 156 (D. Mass. 2014), *appeal dismissed* (Mar. 31, 2014) (police's observations of defendant did not amount to probable cause where police "saw very little of the actual interaction between defendant and the older black male... he testified that he was unable to view either man's hands or whether anything was ever exchanged... [and] had no information about the older black male and did not know if he was a

---

[9] The confidential informant related how CW complained during the purchase about how the heroin "went everywhere" when it was mixed and he had to wear a mask when handling it, gesturing to a powdery outline around his face.  A2-3.

drug user, and the older black male was not followed or questioned after the alleged transaction.").

At the time of the stop, neither the DEA nor the State Police had probable cause to believe Jimenez's car contained evidence of any crime.  Exploiting and prolonging a pretextual traffic stop in order to seize, search, and interrogate suspects without affording them the protections of *Miranda* contravenes the Fourth Amendment, and the fruits of the stop are subject to neither the independent source, inevitable discovery, or attenuation doctrines.  *See Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016) (discussing exceptions to exclusionary rule).  All the evidence gained from the stop should be precluded from the Government's use at trial as fruit of the poisonous tree.

## II.     CW's Identification of Jimenez From A Single Photograph Poses A Substantial Likelihood of Misidentification And Should Also Be Suppressed.

"The standard for determining whether to suppress testimony concerning both out-of-court and in-court identifications is 'that of fairness as required by the Due Process Clause of the Fourteenth Amendment.'"  *United States v. Smith*, 429 F.Supp.2d 440, 447 (D. Mass. 2006), *quoting Manson v. Brathwaite,* 432 U.S. 98, 113 (1977).  If the defendant is able to show "a very substantial likelihood of irreparable misidentification," then the evidence should be excluded. *Id.*  "Courts evaluate the fairness of out-of-court and in-court identifications using a two-step inquiry."  *Smith*, 429 F.Supp.2d 440, 447–48 (D. Mass. 2006), *citing United States v. de Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993).  "[W]here a court finds that the identification procedure used was unnecessarily suggestive, suppression is appropriate unless the government carries the burden of showing, under the totality of the circumstances, that the identification was still reliable."  *United States v. Jones*, 689 F.3d 12, 17 (1st Cir. 2012).  *See also Manson*, 432 U.S. at

114 ("Reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations.")

As part of CW's jailhouse proffer to the Government on August 14, 2014, he implicated Jiminez's passenger in the Lexus as having been the source of a half kilo of heroin delivered to his garage in Leominster on October 4, 2013, and said he had had an ongoing relationship with him for three to four years. A21-22. At some point during this same session, TFO Maki showed CW a single photograph of Jimenez from the license database. CW identified him as the driver of the car, whom he said he had met only on that day. CW said that Jimenez made comments on the day of the delivery indicating that he was aware that he was transporting heroin. A21-22.

"At the first step, we consider whether the photo array included, as far as was practicable, a reasonable number of persons similar in appearance to the suspect." *United States v. DeCologero*, 530 F.3d 36, 62 (1st Cir. 2008). CW's identification of Jimenez was impermissibly suggestive:

> It is axiomatic that identifications achieved through the use of a single photo are highly problematic. A single photo shown to an eyewitness (the proverbial "Is this the man you saw?" question) plainly suggests the guilt of the person pictured... The Supreme Court has held similarly that identifications arising from single-photograph displays may be viewed in general with suspicion.

*United States v. Smith*, 429 F. Supp. 2d 440, 450 (D. Mass. 2006), *citing Manson v. Braithwaite*, 432 U.S. 98, 116 (1977). Here, when shown the photograph during the proffer session as he was discussing the delivery of the heroin, CW indicated that he was "pretty" sure Jimenez was the passenger in the Lexus that he had seen once, briefly, almost a year earlier. A22. *Compare Smith*, 429 F.Supp.2d at 450-451 (agent's single-photo identification of defendant was impermissibly suggestive; agent was in the presence of other officers whom he knew were seeking man whom he had only very generally described when shown single photo of

19

defendant).  *Contrast United States v. Arruda*, 757 F.Supp.2d 66, 70 (D. Mass. 2010) (identification of suspect from neutral surveillance video not irreparably suggestive as witness had given consistent description of person he saw prior to viewing video).  Therefore, it remains to consider whether the identification bears "indicia of reliability [] strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances."  *Perry v. New Hampshire*, 132 S. Ct. 716, 720 (2012).  The five factors weighed in this analysis are laid out in *Neil v. Biggers*:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention to the crime; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

409 U.S. 188, 199-200 (1972).

Here, nearly every factor tells against the admission of CW's identification.  CW had no particular reason, one year previously, to pay any attention to the name or face of the man who he said drove his longtime contact once during their relatively brief interaction on October 4, and had had no occasion to describe him or to recall his face since that time.  Even when sitting in a proffer session attempting to provide as much helpful information to police as possible with the explicit goal of reducing his own exposure to a large set of serious charges, CW was only "pretty" sure that Jimenez's license photo was the man he had seen.  *Contrast Jones* 689 F.3d at 17 (district court's ruling admitting unnecessarily suggestive single-photo identification at trial was not clear error where trained law enforcement observer identified defendant one day after brightly-lit, fifteen to twenty second interaction during drug deal).  Similar to the agent's identification in *Smith*, the highly suggestive conditions of an investigating detective placing a picture before a cooperating witness and asking for confirmation of identity as the suspect is not

outweighed by any of the "strong indicia of reliability" that could support its admission.  The "highly competitive" activities of undercover narcotics agents do not justify "sloppiness" in pursuit of a conviction.  *Smith*, 429 F.Supp.2d at 454.  CW's identification of Jimenez should be suppressed.

WHEREFORE, the defendant respectfully requests that his Motion To Suppress be granted.  In the alternative, the defendant requests a hearing on this issue.


Dated: November 29, 2016       Respectfully submitted,
CARLOS JIMENEZ
By and through his attorneys,


 /s/ *R. Bradford Bailey*
R. Bradford Bailey, BBO#549749
Adamo Lanza, BBO#689190
BRAD BAILEY LAW, P.C.
10 Winthrop Square, 4th Floor
Boston, Massachusetts 02110
Tel.: (857) 991-1945
Fax: (857) 265-3184
brad@bradbaileylaw.com


**Certificate of Service**

I, R. Bradford Bailey, hereby certify that on this the 29th day of November, 2016, I caused a true copy of the foregoing memorandum to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

 /s/ *R. Bradford Bailey*
R. Bradford Bailey