UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Docket No. 16-CR-40025-TSH |
| (1)   IVAN CRUZ-RIVERA and ) | |
| (2)   CARLOS JIMENEZ ) | |
| ) | |
| Defendants. ) | |

### GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO MOTIONS TO SUPPRESS

The United States of America, by and through its attorneys, Acting United States Attorney William D. Weinreb and Assistant United States Attorney Michelle L. Dineen Jerrett, submits this supplemental memorandum in opposition to the defendants Ivan Cruz-Rivera's and Carlos Jimenez's ("Defendants") Motions to Suppress Evidence (the "Motions"). Defendants' Motions should be denied because (1) there was probable cause to stop the vehicle, (2) even without probable cause, there was at a minimum reasonable suspicion justifying the car stop, and the trooper's actions were reasonable as the suspicion level rose to probable cause during the course of the car stop, and (3) neither defendant was ever in custody requiring *Miranda* warnings.

### ARGUMENT

**I.   Probable Cause Existed to Believe Defendants Were Involved in Criminal Activity**

At the time of the car stop, DEA agents and task force officers had probable cause to believe that the occupants (the Defendants) of a Gray Lexus bearing NJ registration D17CLD (the "NJ Lexus") were engaged in criminal activity.[1] Specifically, based upon the facts known to DEA agents and task force officers during its months-long investigation, probable cause existed to

---

[1] Even if this Court were to conclude that probable cause to believe the occupants of the NJ Lexus were engaged in criminal drug activity did not exist at the time of the car stop, at a minimum, Trooper DiCrescenzo had reasonable suspicion of criminal activity thus justifying his further inquiries, as detailed in Section II.

believe that the occupants of the NJ Lexus had delivered heroin to the 105/107 Garages on October 4, 2013, and that evidence of their involvement in drug trafficking would be found in the car.

Probable cause is not equivalent to proof beyond a reasonable doubt. See, e.g., United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999) ("probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable."); United States v. Ciampa, 793 F.2d 19, 22 (1st Cir. 1986) ("The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity.") "Probable cause exists if, at the time of the arrest, the collective knowledge of the officers involved was sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001) (internal quotation marks omitted); see also United States v. Young, 105 F.3ed 1, 6 (1st Cir. 1997) ("Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime").

In this case, at the time of the stop of the NJ Lexus, the following facts were known to law enforcement. DEA had been involved in a months-long investigation of individuals suspected of trafficking in heroin in the Leominster area (1-15 – 17; 1-73).[2] Prior to October 4, 2013, a cooperating source ("CS") had made seven controlled purchases of heroin from an individual named Miguel Rivera ("Rivera") (1-16 – 17; 2-83 – 84). On October 4, 2013, during its continuing investigation, law enforcement made a decision to try to get to Rivera's source, which was believed to be an individual named Segundo Gutierrez ("Gutierrez") (1-18; 1-37 – 38; 2-84 –

---

[2] References to transcripts of the evidentiary hearing in this case are cited by Volume (1 through 8) and page number within that volume (*e.g.,* 1-15 refers to Volume 1, Page 15). References to Exhibits at the suppression hearing are cited as Exhibit ___, and references to the Appendix filed under seal with Jimenez's Motion are cited as A.___.
2

85; Exhibit 2). Gutierrez worked at auto body garages located at 105/107 Union Street in Leominster, Massachusetts (the "105/107 Garages") (1-36). On October 4, 2013, the CS went to the 105/107 Garages along with an undercover officer ("UC") in an undercover vehicle in an attempt to purchase 125 grams of heroin directly from Gutierrez (1-41; 1-76; Exhibit 2). Both the CS and the undercover vehicle were equipped with audio and video recording equipment as well as a transmitter so that law enforcement could monitor any conversations in real time (1-19; 1-38 – 39; 1-43 – 45; Exhibits 1 and 2).

The CS and the UC arrived at the 105/107 Garages at approximately 12:06 p.m. (1-41; Exhibit 2). Surveillance observed the CS meet with Gutierrez outside the garage bay closest to Union Street, and then observed the CS and Gutierrez walk inside the garage bay (1-39). While the CS and Gutierrez were inside the garage bay, law enforcement heard their conversation in real-time (1-44), including through the assistance of a fluent Spanish-speaking task force officer monitoring and providing a summary of the transmitted conversation (1-23; 1-42 – 43). During the initial meeting between the CS and Gutierrez, Gutierrez said he was waiting for the heroin to arrive and that it would be ready at approximately 1:30 p.m. (1-47 – 48; 1-55). During that conversation, Gutierrez described the anticipated delivery as "the big batch" (1-47; 1-57). Gutierrez further told the CS to be in touch with Rivera about the deal (1-66 – 67; 2-86).

While inside the garage, Gutierrez told the CS he was not yet sure of the price, but told the CS that he would give him a good price (1-49; Exhibit 2). During his conversation with the CS, Gutierrez was on his cell phone talking to someone, appearing to give directions to the 105/107 Garages (1-49; Exhibit 2). Det. Sgt. Maki, a then-task force officer with DEA, communicated to the surveillance team – which included Trooper Vitale – over the radio that Gutierrez was waiting for the heroin, which was either being delivered or picked up, but that it was on the way (1-59-60).

At approximately 12:15 p.m., the CS and the UC left the 105/107 Garages, but surveillance units remained in the area in light of the information law enforcement had that Gutierrez was expecting the heroin to arrive in short order (1-59 - 60). At approximately 12:18 p.m., only 3 minutes after the CS and the UC left the 105/107 Garages, the NJ Lexus arrived at the 105/107 Garages (1-61; 2-44 – 45). Just prior to the NJ Lexus arriving, agents saw Gutierrez exit the front bay of the garage, on his cell phone, appearing to have a conversation on the cell phone, walk to the street and motion to the NJ Lexus, which subsequently pulled in and drove to the rear part of the 105/107 Garages (1-61; 2-148; Exhibit 2). These observations were significant to law enforcement given the information that Gutierrez was anticipating the arrival of the heroin and was evidenced by the fact that the arrival of the NJ Lexus, Gutierrez's waving to that vehicle, and that the NJ Lexus should be followed were communicated to the surveillance team (1-65). During the entire time that surveillance observed the 105/107 Garages on October 4, 2013, including the comings and goings of other vehicles to and from the garages (2-24; 2-49 - 54; 2-111 – 117; Exhibit 14),[3] the only vehicle besides the UC vehicle that Gutierrez – who law enforcement knew was waiting for a delivery of heroin imminently – had *any* interaction with was the NJ Lexus (2-24; 2-117). In addition, agents testified that the fact that the NJ Lexus had NJ tags was significant because in their training and experience, heroin and other controlled substances are delivered to this area by New York, New Jersey and Pennsylvania (1-62 - 64). DEA ran the NJ Lexus license plate, or tag, at the time that the vehicle arrived at the 105/107 Garages (1-66) which itself shows that the vehicle was significant to DEA at the time it arrived. Even Trooper DiCrescenzo understood the

---

[3] To the extent the Defendants argue that one of the other vehicles that arrived at the 105/107 Garages may have been the source of the heroin, it was nevertheless reasonable for law enforcement to believe that the NJ Lexus was the source of the heroin. See Winchenbach, 197 F.3d at 555-56 (concluding that defendant's alternate theories of drug source not useful as "probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable.")

significance of the NJ Lexus to DEA on October 4, 2013, as he learned during the traffic stop that law enforcement in Worcester had run the NJ Lexus tags a few hours earlier that day (3-44).

Just after after the NJ Lexus pulled down the driveway of the 105/107 Garages, Gutierrez, who had moments before told the CS that he was waiting for the heroin to arrive, walked inside the front garage bay door where he remained for approximately two minutes, walked outside, closed the front garage bay door and walked to the rear of the garages where the NJ Lexus had parked (1-61 - 62; Exhibit 2). At approximately 12:53 p.m., law enforcement observed Gutierrez walking up from the rear garage and re-entering the front garage bay (Exhibit 2).

Between 12:15 p.m., when the CS and the UC left the 105/107 Garages, and approximately 2:20 p.m., the CS had one or more calls with Rivera, who Gutierrez had instructed the CS to contact regarding the drug deal (1-66 – 67; 2-86). Law enforcement was aware that during at least one of these telephone calls between the CS and Rivera, the two of them discussed that Gutierrez wanted a higher price for the heroin (1-67 – 68; 1-76; 2-43 - 44), which suggested that Gutierrez had the heroin. At approximately 2:20 p.m., Rivera told the CS that the heroin would be ready in about 15 to 20 minutes and that Gutierrez was mixing it up (1-68; 1-74; 2-9 – 10; Exhibit 2).

Between approximately 2:09 p.m. and 2:12 p.m., law enforcement observed the NJ Lexus with its two occupants (subsequently identified as the defendants) leave the 105/107 Garages (1-68 – 69; 2-10; Exhibit 14). Agents observed Gutierrez exit the garage, again on his cell phone appearing to be talking on it, heading hurriedly towards the street while the NJ Lexus make a U-turn approximately two minutes after it left and head back towards the garage (1-69; 2-54 – 55; 2-148 - 151). Agents observed Gutierrez waving to the NJ Lexus and motioning with his arm and pointing towards another street onto which the NJ Lexus turned (2-54; Exhibit 2).

At approximately 2:25 p.m., the CS and the UC started heading back to the 105/107

Garages, arriving at approximately 2:36 p.m. (1-74; 2-11; 2-13; Exhibit 2) and pulling towards the rear garage bays at the 105/107 Garages (2-11).   At approximately 2:48 p.m., agents observed Gutierrez leaving the front garage bay and walk toward the rear garages where the CS and UC were waiting (1-75 – 76; Exhibit 2).   Gutierrez went directly to the passenger side of the UC vehicle (2-12), where he exchanged a box containing 125 grams of heroin for $7,500 in cash (1-76).   During the exchange, law enforcement could hear the conversation between the CS and Gutierrez, including Gutierrez's statement that he wore a mask (1-77; 2-13) because the heroin went everywhere when he mixed it in the blender (which the Spanish-speaking officer could hear) (2-13).   By 2:55 p.m., the CS communicated to law enforcement that the deal was done and TFO Maki communicated that information to other law enforcement officers, including Trooper Vitale (1-78; 2-14; 2-161 - 162; Exhibit 2).   In short, by 2:55 p.m., law enforcement – including Trooper Vitale – was aware that the heroin had been delivered, prepared, and sold (1-77 – 78; 2-14; 2-23 – 24; 2-181; Exhibit 2).

Trooper DiCrescenzo effectuated a stop of the NJ Lexus at approximately 3:15 p.m., after *all* of the above-detailed information was known (2-23 – 24; Exhibit 9).

Applying the "collective knowledge" doctrine, Trooper DiCrescenzo was entitled to rely on the collective knowledge of all of the law enforcement officers involved in the DEA investigation, including Trooper Vitale who directed him to effectuate the car stop.   As the First Circuit has previously recognized, "reasonable suspicion or even probable cause can be established by the 'collective knowledge' or 'pooled knowledge' principle."   United States v. Barnes, 506 F.3d 58, 62-63 (1st Cir. 2007); see also United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986).   Under that doctrine, "law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is

committing a crime." United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997). This principle was reaffirmed in the two 2017 opinions: United States v. Arias, 848 F.3d 504, 512 (1st Cir. 2017) and United States v. Mott-Frye, 2017 WL 1508176 at *4 (Saris, CJ) (D. MA 4/26/2017). The doctrine "permits an officer to stop, search, or arrest a suspect at the direction of another office or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." United States v. Williams, 627 F.2d 247, 252 (7th Cir. 2010); see United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002) (focus is on aggregate knowledge possessed by officers involved in investigation).

The Defendants argue that because Trooper Vitale advised Trooper DiCrescenzo that he would have to form his own basis to stop the NJ Lexus without regard to the information Trooper Vitale knew or communicated, this somehow vitiates the probable cause that existed. This argument is wholly without merit. The fact that Trooper Vitale made this request in order to preserve the on-going drug investigation does not mean that Trooper DiCrescenzo lacked probable cause (or at least reasonable suspicion) to make the stop. See United States v. Norton, 2016 WL 3012295, *3 (N.D. Ind. 2016) (rejecting defendant's contention that because the car stop was "walled off" from the remainder of the drug investigation, "collective knowledge" doctrine inapplicable to impute knowledge of drug investigation as basis for stop). In Williams, 627 F.3d at 253, the defendant made a similar argument, which the Seventh Circuit found unavailing:

> Williams attempts to distance his case from *Rodriguez* and *Celio* based on Guiterrez's instruction that Simon develop his own probable cause to stop and search the Suburban. According to Williams, that statement precluded Simon from relying on the DEA's knowledge, and therefore Simon could not have been acting in objective reliance on the information he received from Gutierrez, as is required for application of the collective knowledge doctrine. We disagree with Williams's characterization of the instruction. Gutierrez did not forbid Simon from relying on the information collected by the DEA task force. Rather, Gutierrez sought to conceal the existence of the DEA investigation and wire taps from Williams and

Howard.   That effort has no impact on the fact that the DEA agents had probable cause, on which Simon was entitled to rely.

The collective knowledge of Trooper Vitale and other DEA law enforcement working on the on-going investigation is properly imputable to Trooper DiCrescenzo.   As DEA possessed probable cause (or at a minimum, reasonable suspicion) at the time of the stop of the NJ Lexus to believe that the Defendants were involved in criminal activity, specifically drug trafficking, and that evidence of such may be found in the car, so too did Trooper DiCrescenzo.   The subjective intentions of the law enforcement officials involved have no bearing on the question of whether probable cause (or reasonable suspicion) existed, as that determination is based upon an objective standard rather than a subjective one.   United States v. Mendenhall, 446 U.S. 544, 554 n.6 (1980).

**II.     Even Without Collective Knowledge, Reasonable Suspicion Existed for *Terry* Stop Which Developed into Probable Cause**

Even without imputing the collective knowledge of other law enforcement personnel to Trooper DiCrescenzo, based on the information directly provided to him by Trooper Vitale, Trooper DiCrescenzo was justified in conducting a *Terry* stop.   Terry v. Ohio, 392 U.S. 1, 19-20 (1968).   Moreover, Trooper DiCrescenzo's actions during the traffic stop were objectively reasonable both in terms of the initial stop and the actions undertaken during the stop.   See, e.g., id. at 20; United States v. Ruidiaz, 529 F.3d 25, 28-29 (1st Cir. 2008) (officer's actions during stop "must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation") (quotations omitted).   In United States v. Arnott, the First Circuit discussed reasonable suspicion as follows:

> Reasonable suspicion requires more than a naked hunch . . . but less than probable cause . . . . In the broad expanse between these two poles, the court's assessment must be made in light of the totality of the circumstances . . . [R]easonable suspicion is more a concept than a constant:   it deals with degrees of likelihood, not with certainties or near certainties.   It makes due allowance for the need for police officers to draw upon their experience and arrive at inferences and deductions that

> 'might well elude an untrained person.' . . . By like token, an appraisal of an officer's conduct after the initial *Terry* stop necessarily entails an element of flexibility: the officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.'

758 F. 3d 40, 44 (1st Cir. 2014) (quotations and citations omitted).

Here, the heightened suspicion during the stop developed into probable cause to believe that the Defendants were engaged in criminal activity, specifically drug trafficking. Prior to the lawful stop of the NJ Lexus, Trooper DiCrescenzo possessed knowledge of the following facts learned directly from Trooper Vitale:[4] (1) DEA was involved in an investigation (2-180; 3-19), (2) DEA had been purchasing drugs (2-180), (3) the NJ Lexus (including a detailed description of the vehicle, it's license plate number and that there were two occupants) was involved in the investigation[5] (2-157; 3-19 - 20; 3-85; 3-151 - 152; 4-24), (4) the NJ Lexus was coming from Leominster (2-160; 3-19), (5) the NJ Lexus was traveling on the Mass Pike and believed to be heading to Rte. 84 (2-154; 2-156 – 157; 3-19; 4-10); and (6) Trooper Vitale believed the NJ Lexus contained a large amount of cash or drugs or both (2-180 – 181; 3-19 - 20; 3-85; 3-152). In addition, based upon his own training and experience, including in drug investigations, Trooper DiCrescenzo knew that DEA investigates large-scale narcotics trafficking (3-19), illegal drugs are often transported to Massachusetts from New York, New Jersey and Pennsylvania, and that money is usually transported back to those areas west along Route 84 in Massachusetts (3-15).

It is undisputed that Jimenez, the operator of the NJ Lexus, committed a traffic violation (3-27; Exhibits 9 and 11), and Trooper DiCrescenzo was justified in effectuating the car stop. Aside from witnessing the traffic violation, Trooper DiCrescenzo also had a reasonable suspicion that the

---

[4] The information from Trooper Vitale does not fall under the collective knowledge doctrine as it is information directly communicated from the trooper and does not rely on uncommunicated information that would be imputed to Trooper DiCrescenzo.

[5] Indeed, Trooper DiCrescenzo testified that after his conversation with Trooper Vitale, he understood that the NJ Lexus had been involved in a drug transaction earlier that day (3-166 - 167).

occupants of the NJ Lexus were engaged in criminal activity based upon the information from Trooper Vitale.[6]  See United States v. Alix, 630 F.Supp.2d 145, 153 (D. Mass. 2009) (finding reasonable suspicion where target was involved in drug dealing, car affiliated with the defendant was seen at target's house for drug transaction, information led law enforcement to believe that drug deal was to occur on day of car stop and surveillance placed car heading towards Massachusetts on day of planned deal).  From the outset of Trooper DiCrescenzo's interaction with the Defendants, this reasonable suspicion was heightened, and his actions to continue to investigate possible drug activity were justified.  As the car stop progressed, reasonable suspicion escalated into probable cause.  First, when Trooper DiCrescenzo approached the NJ Lexus, he made observations about both defendants' extremely nervous behavior (3-29; 3-158 - 159), behavior that he testified in his experience was beyond the normal level exhibited by people who are pulled over (3-29 – 31; 3-158 - 159).[7]  Jimenez's hands were trembling and shaking when Trooper DiCrescenzo first approached the NJ Lexus (3-29) and continued to do so when he was attempting to retrieve his requested identification (3-32).  Jimenez also produced a New Jersey firefighter credential in addition to his driver's license (3-31 – 32), which Trooper DiCrescenzo testified drew his attention because of the other nervous behavior Jimenez was exhibiting (3-162; 4-64).  Cruz-Rivera, in the passenger seat, also appeared very nervous; his eyes and head were locked straight forward, avoiding eye contact with the trooper, but his body was fidgeting and he was itching various parts of his body (3-29 –

---

[6] While it may be hearsay (which is appropriate for the court to consider here), this is not collective knowledge as it is not imputing uncommunicated information known to other law enforcement officers to him.

[7] Although nervousness alone, and viewed in a vacuum, may be insufficient to elevate suspicions, when viewed in the totality of circumstances here, it justified Trooper DiCrescenzo's further questions.  See United States v. Mendonca, 682 F.Supp.2d 98, 106 (D. Mass. 2010) ("A traffic stop is not necessarily limited to its initial scope. It is an ongoing process and 'the propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold.'") (citations omitted); Ruidiaz, 529 F.3d at 29 (noting that "Terry stop is not necessarily a snapshot of events frozen in time and place. . . . As the investigation proceeds . . . the officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.'"); Chhien, 266 F.3d at 6 ("Importantly, an officer may gradually shift her focus and increase the scope of her investigation if her suspicions mount during the course of the detention.").

30).    Trooper DiCrescenzo asked Jimenez when was the last time he was pulled over (which the government submits is a routine question in a car stop),[8] and Jimenez's response was "Never, I follow the law" (3-31; 3-33 – 34; 3-161; Exhibit 9).    Trooper DiCrescenzo testified that this response seemed odd to him (3-31).    While the trooper spoke with Jimenez, Cruz-Rivera continued to fidget and refused to make eye contact (3-29 – 30).    Jimenez's hands continued to shake and tremble (3-32).    Given his heightening suspicion, Trooper DiCrescenzo asked Jimenez where they had been coming from (also a routine question during a car stop), and Jimenez told him that he was coming from Lawrence (3-32 – 33; 3-97 - 98), which Trooper DiCrescenzo knew was not true because the vehicle had been followed to Sturbridge from Leominster by Trooper Vitale (3-33). Jimenez also told Trooper DiCrescenzo that he had been in Lawrence for two hours, they had left New Jersey that same morning and were returning to New Jersey at the time of the stop (3-34). Trooper DiCrescenzo testified that he found this information concerning because of the long distance between Englishtown, NJ and Lawrence (which the trooper estimated to be approximately 200 miles each way), and the fact that they said they traveled from NJ to Lawrence that morning, spent two hours in Lawrence visiting family and were returning to NJ (3-34 – 35; 3-43; 3-164; Exhibit 9).    Jimenez reiterated that he had been visiting family in Lawrence (3-34).    Based upon the information from Trooper Vitale, the nervousness of the defendants, the unlikely travel plans and the inconsistency between what Jimenez said and what Trooper DiCrescenzo knew from Trooper Vitale, he suspected that the defendants may be involved in criminal activity and asked the passenger, Cruz-Rivera, for identification (3-35; 3-92 - 94).    Trooper DiCrescenzo then returned to

---

[8] Chhien, 266 F.3d at 9 (concluding that questions regarding travel, unrelated to purpose of original stop, were lawful under the circumstances where suspicions raised during initial questioning).   "Routine questioning of this sort, even when not directly related to the violations that induced the stop in the first place, is not uncommon during a highway stop."   Id.   An officer may "make reasonable inquiries of the suspect designed to confirm or dispel his suspicions."   United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000).

this cruiser to check the validity of Jimenez's license and to run warrant checks on the defendants (3-98 – 99). Although Trooper DiCrescenzo learned that there were no active warrants for Jimenez and that Jimenez's license was valid (3-40 – 41), he learned that there was no exact record matching the name on the Puerto Rican identification card Cruz-Rivera provided (3-102), and he also learned that the vehicle's NJ tag had been queried by law enforcement in Worcester a few hours earlier that day, which contributed to his increasing reasonable suspicion because Jimenez had stated that they had been to Lawrence (not Worcester) (3-44).

Once a motor vehicle has been lawfully stopped (and there is no argument in this case that the stop here was not lawful),[9] officers may order the driver and other occupants out of the vehicle without violating the Fourth Amendment. See Pennsylvania v. Mimms, 434 U.S. 106, 111, n.6 (1977) (pertaining to drivers); Maryland v. Wilson, 519 U.S. 408, 415 (1997) (pertaining to passengers). Defendants argue that because Trooper DiCrescenzo testified that he did not view the defendants as being free to leave, this somehow translates into a custodial interrogation. This is simply not the law. Whether a person is in custody for purposes of *Miranda* means both that a reasonable person in the individual's position would feel that he is not free to leave *and that the individual is subject to coercive pressure to answer questions posed to him*. United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010) ("Once a court finds that a reasonable person in the suspect's position would not have felt free to end the interview and walk away, there is a further question whether the suspect would reasonably find the circumstances coercive . . . "); Berkemer, 468 U.S. at 436-37 (acknowledging that traffic stop "significantly curtails . . . 'freedom of action,'" but also must determine "whether a traffic stop exerts upon a detained person pressures that

---

[9] That the stop was pretextual does not invalidate it. Whren v. United States, 517 U.S. 806, 812-13 (1996).

sufficiently impair his free exercise of his privilege against self-incrimination" to require *Miranda* warnings). "[M]ost people do not feel free to leave when they are stopped by the police, and that perception alone does not amount to being in custody." U.S. v. Azubike, 2006 WL 519784 at *2 (D. Mass. 2006) (not reported in F.Supp.2d). There was no coercive pressure on either defendant to answer questions here, and there is no evidence to the contrary. The Defendants were simply never in custody at any point during the traffic stop, and certainly not when questioned briefly both inside and standing outside the NJ Lexus.[10]

Trooper DiCrescenzo's request that Jimenez step outside the NJ Lexus (and his subsequent request that Cruz-Rivera do the same) was entirely reasonable under the totality of circumstances. Once outside the vehicle, Trooper DiCrescenzo's questions of Jimenez (and later of Cruz-Rivera) were entirely appropriate, and reasonable; and Trooper DiCrescenzo "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly, during which time it was necessary to detain the defendant." Sharpe, 470 U.S. 675, 686 (1985) (noting that while length of stop is important factor, court must consider law enforcement purposes to be served by stop as well as time reasonably needed to effectuate those purposes); see also United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) ("A long duration [car stop], however, does not by itself transform an

---

[10] There was no physical restraint of either defendant; Jimenez was asked to sit in the cruiser and he consented (3-177 – 178). See United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009) (placing suspect in back of cruiser while officer wrote traffic citation did not transform stop into *de facto* arrest); Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004) (detention of suspect in back of cruiser, with an officer in close proximity, does not turn stop into *de facto* arrest). Indeed, Trooper DiCrescenzo specifically told Jimenez that he was not under arrest, explaining that waiting in the back of the cruiser was for Jimenez's safety as well as the trooper's (3-47). Where the use of handcuffs does not necessarily transform the stop into a *de facto* arrest, see United States v. Rabbia, 699 F3d 85, 92-93 (1st Cir. 2012) (brief prophylactic use of handcuffs did not transform stop into an arrest), consent to sit in the cruiser should not either. Even if this Court were to determine, however, that Jimenez was in custody when he was asked to sit in Trooper DiCrescenzo's cruiser (which the government disputes), the record demonstrates that the only thing Jimenez was asked after that point (which may have occurred outside the cruiser) was whether he would consent to a search of the vehicle (3-63 – 64; 4-40 – 41; 4-45 - 46). The government submits that Trooper DiCrescenzo's reasonable suspicion had developed into probable cause by that point, which justified a warrantless search of the vehicle even absent Jimenez's consent. United States v. Bizier, 111 F.3d 214, 216-20 (1st Cir. 1997).

otherwise valid stop into an arrest."); United States v. McCarthy, 77 F.3d 522, (1st Cir. 1996) (noting that "there is no talismanic time beyond which any stop initially justified on the basis of *Terry* becomes an unreasonable seizure under the [F]ourth [A]mendment") (citations omitted). Trooper DiCrescenzo's subsequent questions were tied directly to the issues about which he had reasonable suspicion – namely, where the occupants had been, who they had met with (and the identity and location of the meeting), whether they had made other stops, whether there were guns, drugs or large amounts of cash in the car.   Chhien, 266 F.3d at 9 (concluding that questions regarding travel, unrelated to purpose of original stop, were lawful under the circumstances where suspicions raised during initial questioning).   "Routine questioning of this sort, even when not directly related to the violations that induced the stop in the first place, is not uncommon during a highway stop."   Id.   An officer may "make reasonable inquiries of the suspect designed to confirm or dispel his suspicions."   United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000); Ruidiaz, 529 F.3d at 29 ("officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention'").

As Trooper DiCrescenzo continued his investigation, the reasonable suspicion elevated into probable cause based upon the following factors:   (1) both occupants were nervous; Jimenez was shaking and Cruz-Rivera was fidgeting and avoiding eye contact (3-29 – 30; 3-32; 3-50); (2) *both defendants* indicated, and Jimenez indicated repeatedly, that they had been in Lawrence and had come from Lawrence (despite the fact that they had come from Leominster) (3-32 – 35; 3-49, (3) *both defendants* stated that they made no other stops in coming from Lawrence (despite the fact that they had come from Leominster) (3-45; 3-50 - 51), (4) Jimenez provided inconsistent answers to who he had been visiting in Lawrence, telling Trooper DiCrescenzo first that he was visiting his cousin, and later saying he was visiting his brother-in-law, neither of whom he could not name (3-

45; 3-108 - 109), (5) Jimenez could not provide a location where he had purportedly met his family member(s) in Lawrence (3-45; 3-106 - 107), (6) Jimenez told Trooper DiCrescenzo that his passenger (Cruz-Rivera) had money in the car when asked if there were any large amounts of cash in the car (3-45 - 47); (7) Jimenez then told Trooper DiCrescenzo that Cruz-Rivera was looking to purchase a truck, although he could not explain why he had not mentioned that previously (3-47) (and, inexplicably, he did not tell Trooper DiCrescenzo that they in fact had gone to Leominster to look for a truck with Gutierrez if Cruz-Rivera's testimony is to be believed); (8) Cruz-Rivera was evasive about how much money was in the car, and at one point stated that there was $1000 (3-51 – 53; 3-57; 3-125); (9) Cruz-Rivera consented to show the trooper the money, but attempted to shield the trooper's view of the backpack that he reached for and in (3-57 – 58; 4-60 - 61); (10) Trooper DiCrescenzo saw bundles of cash inside a manila envelope inside the backpack, well in excess of $1000, bundled in a way consistent with drug proceeds (3-58 – 60); and (11) Cruz-Rivera initially could not provide an explanation for the significant amount of cash in the backpack (3-62 – 63; Exhibit 9).[11]

To the extent it did not exist before, under the totality of circumstances this Court is required to consider,[12] by the time Trooper DiCrescenzo saw the bundles of cash inside the manila envelope inside the backpack, he had probable cause to believe that the defendants were engaged in criminal

---

[11] After the Massachusetts State Police narcotics-trained K-9 positively alerted to the backpack and its contents and the troopers searched the NJ Lexus, Cruz-Rivera then stated that he had been looking to purchase a truck (3-63; 3-66 – 69; Exhibit 9), although he did not previously provide that information (and, notably, was able to communicate that information to Trooper DiCrescenzo in English despite his claims that he speaks and understands very little English).

[12] In evaluating the totality of the circumstances, a court may not consider each fact in a vacuum. United States v. Arvizu, 534 U.S. 266, 272 (2002) (rejecting the approach taken by the Ninth Circuit in attempting to delimit the extent to which certain factors may be considered as a type of "divide-and-conquer analysis."). Reasonable suspicion may exist even if each fact standing alone could have an innocent explanation. Id. at 751, 753. "Totality of the circumstances takes into account every possible element of suspicion." United States v. Santiago Vega, 228 F.Supp.2d 2, 8 (D.P.R. 2002).

activity and his subsequent warrantless search of the vehicle was justified.  See, e.g., United States v. Quinn, 815 F.2d 153, 159-60 (1st Cir. 1987); Bizier, 111 F.3d at 216-20.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motions to Suppress should be denied.

                                                Respectfully submitted,

                                                WILLIAM D. WEINREB
                                                Acting United States Attorney

By:   */s/ Michelle L. Dineen Jerrett*
       MICHELLE L. DINEEN JERRETT
       Assistant U.S. Attorney
       United States Attorney's Office
       District of Massachusetts
       Donohue Federal Building
       595 Main Street
       Worcester, Massachusetts 01608
       Michelle.Dineen.Jerrett@usdoj.gov

Date:   November 2, 2017

---

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                /s/ Michelle L. Dineen Jerrett
                                                Michelle L. Dineen Jerrett
                                                Assistant U.S. Attorney

Date:   November 2, 2017