UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>IVAN CRUZ-RIVERA and<br>CARLOS JIMENEZ,<br><br>Defendants. | CRIMINAL ACTION<br>No. 16-40025-TSH |

HILLMAN, D.J.

FINDINGS AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS
August 14, 2018

Introduction

The Defendants are charged with multiple drug offenses. They seek to suppress from introduction into evidence at trial, cash that was seized and certain statements that were made during a motor vehicle stop that occurred on October 4, 2013. Defendant Jimenez also seeks to suppress an out-of-court single photo identification. For the reasons set forth, these motions are denied.

Facts

Beginning in 2012, a Drug Enforcement Agency ("DEA") task force operating in the Worcester area began an investigation into the drug trafficking activities of Miguel Rivera. Between May 2012 and October 2013, several purchases of heroin from Mr. Rivera took place through the use of a confidential source ("CS"). While Mr. Rivera was the initial target, it was

learned early in the investigation that his probable source of supply was another individual named Segundo Gutierrez.

During several controlled purchases of heroin, Mr. Rivera arrived in a motor vehicle that was rented under the name of Segundo Gutierrez. During those transactions, Mr. Rivera visited two garage bays, located at 105-107 Union Street, in Leominster, Massachusetts, that were controlled by Gutierrez. It was believed by the authorities that Mr. Rivera would get heroin from Gutierrez at those garages before selling it to the CS.

By October 4, 2013, the task force had decided to attempt to deal directly with Gutierrez at 105-107 Union Street. On that date, shortly after noon, the CS, accompanied by an undercover police officer, drove to the Union Street location in a vehicle that had been outfitted with audio and video recording devices. This interaction between the CS and Gutierrez was set up without any prior notice to the Gutierrez. Prior to contact, the police had set up surveillance of the garage complex and surrounding neighborhood. Task Force Officer, Sergeant John Maki, observed the undercover vehicle pull up to the garage complex and watched the CS exit the vehicle and go to the garage where he was met by Gutierrez. Thereafter, Gutierrez and the CS went into a garage bay. When the CS returned to the car he told the undercover officer that a "big batch was coming" and that he was to call back in 15-20 minutes (specifically, Gutierrez told the CS "you will have it in your hands by 1:30"). At approximately 12:15 p.m., the undercover vehicle left the Union Street address and met with the surveillance team. During this debriefing session the CS reported that while he was negotiating for the heroin, Gutierrez had received a phone call during which he gave directions on how to get to the garages on Union Street.

Approximately three minutes after the undercover vehicle left the garage, the surveillance units that had remained at Union Street reported that Gutierrez left the garage area and walked

2

out to Union Street talking on his cellphone. They observed him wave a grayish blue Lexus with New Jersey license plates into the driveway at Union Street. That vehicle entered the 105-107 address and drove to the far end of the garage bays.

While the undercover vehicle was at the Union Street garage, Gutierrez had given specific instructions to the CS to contact Miguel Rivera before he came back. The CS finally made contact with Miguel Rivera via cellphone at 2:20 p.m. and they discussed price. After that phone call, the authorities instructed the officer and CS to return to Union Street and wait at the garages. The Lexus was in the garage area from approximately 12:20 p.m. until shortly after 2:00 p.m.

While the Lexus was in the garages, it parked in the rear of the bay furthest from the street, where it was joined by Gutierrez's truck (driven by an unknown male). When the Lexus left the garage after 2:00 p.m. it apparently got lost in the neighborhood, and was directed to the highway by Gutierrez, who went out to Union Street to point it in the right direction. Massachusetts State Police Officer and Task Force Agent Jamie Vitale was assigned to follow the vehicle and make an 'identification stop' away from the area of investigation, so as not to compromise the investigation.

When the undercover vehicle returned to the garages at 2:20 p.m. the CS purchased 125 grams of a substance believed to be heroin for $7,500.00. This purchase was made after the undercover vehicle waited at the garages for 20-30 minutes. Thereafter the CS and the undercover officer were met by the Task Force Officers at approximately 2:55 p.m.

Trooper Vitale followed the vehicle and reported that there were two male individuals in the vehicle with darker skin. Because Task Force Officer Maki had requested that he stop the vehicle and identify the occupants, he called the Sturbridge Massachusetts Barracks to determine

3

whether a patrol car assigned to Route 84 was available to assist. His phone call was passed on to Trooper David DiCrescenzo. Trooper Vitale and Trooper DiCrescenzo had previously collaborated to stop motor vehicles under similar circumstances. Trooper Vitale told Trooper DiCrescenzo that he was following the target vehicle on the Massachusetts Turnpike and that they were west of Auburn. He told Trooper DiCrescenzo the license plate number, the vehicle description, and that it was occupied by two Spanish men. Trooper Vitale told him he was looking to identify the occupants of the vehicle with regards to a drug investigation but that Trooper DiCrescenzo would have to develop his own probable cause if he wanted to access the inside of the vehicle.

At approximately 3:15 p.m., Trooper DiCrescenzo intercepted the vehicle at the median strip just west of a tollbooth on Route 84. He followed it for a couple of miles and when he observed the vehicle change lanes and follow another vehicle too closely, he pulled the vehicle over. Trooper DiCrescenzo approached the vehicle and asked the operator for his license and registration. The trooper identified the operator of motor vehicle as the defendant, Carlos Jimenez. He observed that both of the individuals in the vehicle were extremely nervous. The operator's hands were physically shaking and the passenger in the motor vehicle was seen staring straight ahead, avoiding eye contact with the officer and nervously fidgeting in his seat. Trooper DiCrescenzo asked Jimenez if he had ever been stopped before and he responded that he had not been stopped and that he follows the law. Trooper DiCrescenzo thought that answer was a little strange. In addition to producing his license and registration Jimenez, produced or made visible, a firefighter's badge. After receiving the license and registration, Trooper DiCrescenzo asked the occupants where they were coming from. Jimenez responded that they were coming from Lawrence, Massachusetts, that they had left New Jersey that morning, and were returning when

4

he stopped them. According to Trooper DiCrescenzo, this raised concerns because it is a long trip from New Jersey to Lawrence to spend two hours and then return.

Because of the nervousness exhibited by the occupants and the unlikely travel plans, Trooper DiCrescenzo said he suspected criminal activity was involved and asked the passenger in English for identification. The passenger produced his identification, and in the DiCrescenzo's opinion, he had no difficulty understanding. After receiving this information, DiCrescenzo returned to the vehicle and asked the operator to step out so that he could question the driver and the passenger separately. While DiCrescenzo was waiting for State Police dispatch to return license and warrant information, he learned through his own inquiries that there was a recent query on the license plate earlier that day in Worcester, which wasn't consistent with the driver's story that they were coming from Lawrence, Massachusetts. He also learned that the operator's license in New Jersey was active and that there was no outstanding warrants for either occupants.

When the DiCrescenzo had separated the two defendants he first asked the defendant Jimenez who he went to visit in Lawrence. Jimenez responded that he had gone to visit his cousin, but when asked his cousin's name he could not produce that information and changed his story to say that he was visiting his brother-in-law. When asked, he didn't know his brother-in-law's name either. He stated that they had met at a store in the Lawrence area and that they had not made any stops on their trip from New Jersey to Lawrence and back. DiCrescenzo asked Jimenez if there were any weapons or drugs in the car, to which he responded "no." He asked if there were large sums of cash in the car and he responded, "I think he has some cash" referring to the passenger. When he asked why there was a large amount of cash in the car, Jimenez responded that they were looking at a truck to purchase. After he completed his initial

5

questioning of Jimenez, he placed him in the back seat of his cruiser and then spoke with the passenger, Ivan Cruz-Rivera.

Trooper DiCrescenzo asked Cruz-Rivera to step out of the motor vehicle and questioned him in English. According to Trooper DiCrescenzo, he asked the passenger the same questions that he had asked the driver. When he advised Cruz-Rivera that the driver said that there was a large sum of cash in the car Cruz-Rivera reached into his pocket and pulled out a small sum of money. When the trooper asked if that was all the cash that was in the vehicle, the passenger responded that he did not understand. Because of that answer, DiCrescenzo called Trooper Luis Dejesus, a fluent Spanish speaking trooper who worked at the Sturbridge Barracks, and asked him to translate the conversation over the cellphone. DiCrescenzo put his cellphone on speaker mode, and as he spoke into the phone Trooper DeJesus translated what was said. DiCrescenzo, with the help of DeJesus, again asked Cruz-Rivera about the large sum of cash in the vehicle. Cruz-Rivera answered that there was $1,000.00 in the car. When Trooper DiCrescenzo asked Mr. Cruz- Rivera to show him the money, Cruz-Rivera went to the backseat of the vehicle and attempted to open a black bag that was on the seat. Cruz-Rivera attempted to use his body to shield the trooper's view of the bag and the trooper asked him to step aside so that he could have a clear view of the bag for his own safety. Because Cruz-Rivera ignored him he pushed him to the side so that he could view inside the bag which contained a large sum of United States currency.

Once DiCrescenzo saw the large amount of cash, he had Cruz-Rivera stand to the side of the vehicle and again questioned Jimenez about why there was some much cash in the vehicle. Jimenez replied that they were looking for a truck to purchase. DiCrescenzo also asked Jimenez for permission to search his vehicle and, according to the DiCrescenzo, Jimenez consented.

Around this time Trooper Boland arrived at the scene and after being briefed on the events of the motor vehicle stop called for a canine to continue search of the vehicle. The troopers' further search of the vehicle recovered no further contraband, however two cellphones were found under the passenger's front seat.

The Defendants called Dr. Michael O'Laughlin, as a witness. Dr. O'Laughlin, is the Director of Interpreter Training at Boston University and he conducted a language proficiency examination of Mr. Cruz-Rivera. Dr. O'Laughlin conducted three standardized tests; Spanish reading comprehension, English reading comprehension, and oral proficiency.[1] It was Dr. O'Laughlin's opinion that Cruz-Rivera's language skills would enable him to make short answers, usually to known questions, if the questions are simple. He testified that Cruz-Rivera can sometimes understand a question if it is put to him very directly and that his language level would not permit him to understand idiomatic expressions. Dr. O'Laughlin also opined that Cruz-Rivera's Spanish proficiency levels were very low, including his ability to read and comprehend written Spanish.

The defendant Cruz-Rivera testified that he resides in Puerto Rico and that he came to the United States to buy a pickup truck to assist him in his business selling shampoo for horses. He testified that on October 4, 2013 he drove with Jimenez from New Jersey to Jimenez's relative's house in Lawrence, Massachusetts. On their way back from Lawrence they stopped at Gutierrez's house in Leominster because he knew about a flatbed truck that was being sold that he was interested in purchasing. Cruz-Rivera testified that he, Gutierrez, and Jimenez went to

---

[1] Test one, the Spanish comprehension test, is formally known as the Spanish Reading Comprehension Test. The second test of English reading proficiency is CASAS form 80 which is an abilities test that covers reading and listening and other languages aspects as well. The third test of oral proficiency is referred by its BEST.

several places in Leominster to find the person who was selling the flatbed truck and thereafter left to return to New York/New Jersey.

Sometime after the events of October 4, 2013, a cooperating witness ("CW") identified Jimenez as the driver of the car from a single photograph he was shown during a jailhouse interview. During the hearing on the Motion To Suppress, Sergeant Maki was questioned about that identification by Jimenez's counsel. After that cross-examination by Jimenez's counsel, the new case agent DEA Task Force Officer Jeffrey Thibodeau again interviewed Gutierrez and again showed him a single photograph which he identified as Jimenez. This interview took place while the Motion to Suppress was pending and before all of the testimony had been completed.

## Discussion

The defendants argue that Trooper DiCrescenzo's stop of the motor vehicle violated the Fourth Amendment to the United States Constitution. Specifically, that there was no reasonable and articulable objective reason to suspect that the vehicle, or its inhabitants were involved in drug trafficking. They further argue that once the vehicle was stopped, both subjects were "in custody" and should have not been interrogated without being Mirandized.

I will first deal with the stop of the Lexus. Trooper DiCrescenzo testified that he and Trooper Vitale had a prior relationship going back several years and that he was tasked with identifying the occupants of the vehicle. Trooper DiCrescenzo was also told by Trooper Vitale that the investigation was interested in the vehicle with regards to "a drug investigation and that my information would not be the basis of the stop . . . I further stated that access to the inside of the vehicle would not be based upon my information either that he would have to develop his own probable cause if he went in that direction."

Trooper DiCrescenzo testified that he saw the Lexus change lanes without signaling, and then follow too closely. The Defendants argue that the stop was pretextual, however there was no evidence presented at the hearing, via affidavit or otherwise, contesting the validity of the motor vehicle violation. An officer may effectuate a vehicle stop if there is probable cause to believe that the driver has committed a traffic offense, even if the officer had an ulterior motive for the stop. *Whren v. United States,* 517 U.S. 806, 810 (1966).

### The Collective Knowledge Doctrine

The United States argues that DiCrescenzo's stop was supported by the "collective knowledge" doctrine. This "collective knowledge" or "pooled knowledge" principle has been used to arrest in two ways; (1) by tracing the arresting officer's knowledge back to an individual in a law enforcement agency who possessed information sufficient to establish probable cause and (2) by finding that the directing agency as a whole possessed the necessary facts. Under this rubric, law enforcement officials cooperating in an investigation are entitled to rely on each other's knowledge of facts that form a conclusion that a suspect is committing or has committed a crime. *United States v. Ventresca,* 380 U.S. 102, 111 (1965).

The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer, or police agency, even if the officer himself does not have first-hand knowledge of facts that amount to the necessary level of suspicion to the given action. *United States v. Hemsley,* 469 U.S. 221, 232-33 (1985). There is no Fourth Amendment violation if the officer directing the stop, search, or arrest, or the collective knowledge of agency for which he works has sufficient probable cause. *United States v. Harris,* 585 F.3d 394, 400 (7th Cir. 2009). In order for the collective knowledge document to apply the officer taking the action must act in objective reliance on the information received and the officer providing the

information, or the agency for which he works, must have facts supporting the level of suspicion required, and the stop must be no more intrusive then would have been permissible for the officer requesting it. *United States v. Nafzger,* 974 F.2d 906, 911 (7th Cir. 1992).

Based upon the collective knowledge doctrine there was more than ample probable cause to order the stop of the Lexus and to search it. Further, because of the perceived motor vehicle violations, Trooper DiCrescenzo was justified in stopping the vehicle and conducting a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 20-21 (1968). A *Terry* stop must be objectively reasonable in terms of the initial stop and actions taken during the stop, and "must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation" *United States v. Ruidiaz,* 529 F.3d 25, 28-29 (1st Cir. 2008). The task force officers involved in the investigation of the events in Leominster possessed reasonable and articulable suspicion that the occupants of the vehicle were engaged in criminal activity, and that there was probable cause to believe that the motor vehicle contained drugs or money.

The defendants argue that the collective knowledge doctrine cannot apply because Trooper Vitale counselled Trooper DiCrescenzo that he needed to find his own probable cause in an effort not to compromise the investigation. The Government's position is that Vitale's instructions to DiCrescenzo to develop his own basis for stopping the vehicle was not a prohibition on using the information imparted to him, rather it was an attempt to conceal the ongoing investigation.

Trooper DiCrescenzo's instructions to find his own probable cause rather than relying on collective knowledge of the officers in an effort not to compromise the investigation is unaffected by the officers disguise as a mere traffic stop. *United States v. Ramirez,* 473 F.3d 1026, 1038 (9th Cir. 2007). Disguising the stop is a valid law enforcement tactic and did not

change the nature of the stop, or the fact that the stop was made at the direction of an officer who had probable cause under the collective knowledge doctrine.

The parties have devoted a lot of energy to the issue of whether the collective knowledge doctrine was sufficient to give Officer DiCrescenzo sufficient reason to stop the motor vehicle. I find that the collective knowledge doctrine provided sufficient reason to stop the motor vehicle and to search it. At the time that the Lexus was stopped, the DEA had been involved in investigation spanning over seventeen months during which six controlled purchases of heroin had taken place from an individual whom the task force believed was being supplied by Gutierrez, from the Union Street address. The CS went to that address and attempted to purchase 125 grams of heroin. Gutierrez told the CS that he was expecting a delivery by 1:30 p.m. The Task Force observed him on his cellphone giving directions, and shortly thereafter surveillance saw the Lexus enter the garages and leave 2 hours later. When the CS returned to the garage shortly after the Lexus left, he bought heroin and was told by Gutierrez that the marks on his face were from the mask that he was wearing while he processed the heroin. These facts provide ample probable cause for the stop and search.

<u>Whether the defendants should have been Mirandized</u>

The defendants argue that Trooper DiCrescenzo's roadside conduct was a defacto arrest thus requiring the trooper to provide them with *Miranda* warnings. In focusing on *Terry* stops courts have consistently recognized that as "a general rule *Terry* stops do not implicate the requirements of *Miranda* because *Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated, or compelling, atmosphere which necessitates *Miranda* warnings." *United States v. Striefel,* 781 F.2d 953, 958 (1st Cir. 1986). This is not to say however that a *Terry* stop cannot morph into "custody" for *Miranda* purposes, "where the

totality of the circumstances shows a reasonable person would understand that he was being held to 'the degree associated with a formal arrest.'" *United States v. Fornia-Castillo,* 408 F.3d 52, 63 (1st Cir. 2005) (citations omitted). The purpose of *Miranda* is to address those situations involving "custodial" interrogations. Accordingly, *Miranda* does not ordinarily apply outside the context of the inherently custodial interrogation for which it was designed. The Courts have consistently held "custody, for the purposes of Miranda, must be narrowly circumscribed to effectuate the purpose of the warning". *United States v. Campbell,* 741 F.3d 251, 265 (1st Cir. 2013); *see also Minnesota v. Murphy 465 U.S. 420, 430, (1984).*

Since a *Terry* stop does not ordinarily rise to the level of intimidation attendant to a formal arrest, "[t]he ultimate inquiry" is whether there was a formal arrest or a restraint on freedom of movement associated with the formal arrest. *Thompson v. Keoheng* 516 U.S. 99, 112 (1995) (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (citations omitted)).[2] Thus, Courts are required to focus on a number of factors, including:

(1) Whether the suspect was questioned in familiar or at least neutral surroundings;

(2) The number of law enforcements officers present at the scene;

(3) The degree of physical restraint placed upon the suspect;

(4) The duration and character of the interrogation.

I am of the opinion that the officers had probable cause to arrest the Defendants and to search the vehicle. I say this with the belief that regardless of what the defendants said or did during the stop, Trooper DiCrescenzo was going to search the motor vehicle. His plan has no bearing on the question of whether the defendants were in custody. Because there was, at a minimum, articulable and reasonable suspicion that the defendants were engaged in criminal

---

2 While the "quick and dirty" inquiry is typically whether the defendant would have *felt free to leave. See Streifel,* 781 F.2d at 960-62.

activity, the authorities were entitled to stop the vehicle, detain the occupants, and pursue a means of investigation that was likely to confirm or dispel their suspicion.

### The Identification of Jimenez

Finally, the Defendant, Jimenez, has moved to suppress his identification by a CW as an impermissibly suggestive single photo presentation on the grounds that it is unfair and unreliable. Additionally, he has moved to strike the testimony of DEA Task Force Officer Jeffrey Thibodeau. Jimenez argues that the CW's identification should be stricken because the CW identified Jimenez after having seen him only once, during the alleged event of October 4th. Furthermore, as Sergeant Maki reported, when the CW was shown the single photograph of Jimenez during a proffer session, he "was pretty sure" that Jimenez was the driver of the Lexus.

The court's role in considering whether to suppress the identification is to determine whether or not the identification procedure was impermissibly suggestive. The use of a single photograph is permissible for future identification, provided the identification is reliable under the circumstances. If an identification is impermissibly suggestive, then the court must look to whether the identification is reliable given the totality of the circumstance. *United States. v. Arthur*, 764 F.3d 92, 99-100 (1st Cir 2014).

To determine the reliability of identifications, courts are instructed to focus on five factors:

(1) the opportunity of the witness to view the criminal at the time of crime;

(2) the witness's degree of attention;

(3) the accuracy of the witness's entire description of the criminal;

(4) level of certainty demonstrated by the witness's confrontation;

(5) the length of time between the crime and the confrontation.

*United States v. Henderson*, 320 F.3d 92, 100 (1st Cir. 2002).

While the parties appear to agree that the CW had not met Jimenez prior to the October 4th event, they were together at the garage on Union Street for almost two hours. In that time they had conversations and Jimenez allegedly boasted to the CW that he had his firefighter's credentials with him so that if they were stopped by police the police would leave him alone. For the reasons set forth above I find that the single photo identification was not impermissibly suggestive and the identification was sufficiently reliable.

## Conclusion

For the foregoing reasons,

1. Defendant Jimenez's Motion to Suppress (Docket No. 57) is *__denied.__*
2. Defendant Cruz-Rivera's Motion to Suppress (Docket No. 63) is *__denied.__*

*/s/Timothy S. Hillman*
TIMOTHY S. HILLMAN
DISTRICT JUDGE