UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 16-CR-40025-TSH |
| (1)  IVAN CRUZ-RIVERA and | ) | |
| (2)  CARLOS JIMENEZ | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT'S MOTION IN LIMINE TO EXCLUDE PORTIONS OF AUDIO/VIDEO RECORDINGS

The defendant, Carlos Jimenez, by and through undersigned counsel, hereby respectfully moves this Honorable Court to limit the audio/video recordings taken from a bodycam affixed to a cooperating source and a camera affixed to the vehicle of an undercover officer on October 4, 2013. The government has disclosed transcripts of portions of these recordings it intends to introduce at trial. *See* Transcript of Audio from an Undercover Vehicle ("UC"), attached hereto as Exhibit A; Transcript of Audio from Confidential Source's ("CS") Person, attached hereto as Exhibit B. The defendant respectfully submits, for the reasons set forth herein, the highlighted portions of Exhibits A and B are inadmissible and must be excluded.

## BACKGROUND

In 2012, the High Intensity Drug Trafficking Area ("HIDTA") task force for Worcester began investigating Miguel Rivera ("MR") of suspected heroin distribution. A cooperating source ("CS") working as an informant for the task force made a total of seven (7) controlled buys of

1

heroin from MR between May, 2012 and September, 2013.[1]  During this time, the task force came to believe MR's source of supply was Segundo Guttierez ("Guttierez").   On the day of the controlled buy in September, 2013, the CS first attempted to make the purchase directly from Guttierez by meeting him at the location out of which Guttierez was suspected of operating, a garage at 105-107 Union Street, Leominster, MA ("target location"), but was instead instructed to meet MR at a location in Fitchburg where the sale (125 grams of heroin for $7,500) was allegedly consummated.

On October 4, 2013, the task force directed the CS, in concert with an undercover officer ("UC"), to again attempt to make a purchase directly from Guttierez.[2]  The UC and the CS drove in the UC's vehicle to the target location who, according to the CS, was not expecting them. While the UC remained in his vehicle, the CS greeted Guttierez outside the target location and reminded Guttierez that he "came with the truck the other day" (presumably in reference to the September 5, 2013 controlled buy); Guttierez invited him inside.   The CS stated "that guy," apparently in reference to MR, gave him a phone number which the CS "forgot to save," which Guttierez then recited for him (508-630-6563).   The CS stated he was "looking for something" and responded "one twenty-five" when asked by Guttierez "[h]ow much."   The CS then explained he came directly to Guttierez because "he's going to… charge me a different price." Guttierez then received a phone call during which he can be heard giving what appear to be directions from I-90; Guttierez can then can be heard telling someone over the phone that "Ivan is here by the mall" and instructing

---

[1] Prior to each of these controlled buys, the CS equipped with an audio recording device.

[2] Prior to the attempted purchase, the UC's vehicle and the CS's person were equipped with audio recording devices.  The government intends to play these recordings, as well as to provide the jury with transcripts which contain English translations of the recordings, during its case-in-chief.

them to "go to K-Mart's garage" and "[h]e's going to follow you.[3]   The CS and Guttierez then resume their conversation during which they appear to discuss price.   Guttierez tells the CS to "[g]ive me like twenty minutes and call him" (presumably MR) but that he should "have it in your hands" by 1:30PM. The CS then departs the target location in the UC's vehicle and the two (2) discuss what just transpired inside.

At approximately 1:36PM, the CS and (a) member(s) of the task force discuss whether the CS should contact MR first or Guttierez directly, and apparently decide to contact MR per Guttierez's instructions.   The CS then calls MR at approximately 1:40PM and the CS, after the call has concluded, said he was told by MR that MR would be "calling [Guttierez] to see if I can just pick it up… at the garage."   At approximately 1:50PM, the CS received a phone call and afterwards states he was told that "[h]e'll be ready in… fifteen to twenty minutes."   Then, at approximately 2:34PM, the CS and UC park outside the target location and the CS calls MR to advise him of his arrival.   At approximately 2:54PM, Guttierez then approaches the UC vehicle and the 125-gram purchase is allegedly consummated.

## ARGUMENT

The defendant respectfully objects to the highlighted portions of the recordings from the UC's vehicle and the CS's person which have been attached hereto as Exhibits A & B.   The content of the highlighted objected-to portions of the transcripts can be characterized as falling within the following three (3) broad categories:

**(1) Statements by TFO John Maki which characterize the nature/purpose of the recording.**   *See* Ex. A at ¶1 ("CS is attempting to make a hundred-and-twenty-five-gram

---

[3] Call detail records for Guttierez's phone show an outgoing call when these instructions are given to the same 508-630-6563 number that Guttierez said belonged to MR.

heroin buy from Segundo Gutierrez…"), ¶114 ("Maki, again, October fourth, Friday, one thirty-three p.m. We're sending CS back over to one oh seven Union Street… with [UI] Segundo Gutierrez and [to] consummate the original purchase of a hundred twenty-five grams of heroin. Ready to go!"); Ex. B at ¶1, ¶277.

(2) **Telephonic communications between the CS and Miguel Rivera and/or TFO Maki in which only the CS's side of the conversation, but not the other parties', can be heard.** *See* Ex. A at ¶74, ¶143, ¶163; ¶198, ¶225; Ex. B at ¶237, ¶241, ¶305, ¶324, ¶359, ¶381.

(3) **Statements by the CS in which he describes what the other party (Miguel Rivera or TFO Maki) stated during these telephonic communications.** Ex. A at ¶165 ("See? I… He's not even ready. Now, when… when I wa-… when I got there, the guy… the guy that was… somebody that was there is the one that brought him the stuff, so he's getting it all ready for me and he wasn't ready for me right now, so he's getting ready for me and he'll be ready for me in… t-… fifteen to twenty minutes, he said he'll be ready. See? He's making it right now."), ¶225 ("He says he's coming out right now. We'll see."); Ex. B at ¶305, ¶326.

A.     **Statements of TFO Maki.**

The defendant respectfully objects to the statements in the transcripts of TFO Maki which describe the purpose/nature of the underlying recordings.  As grounds therefor, these statements are hearsay and are only relevant if offered for the truth.  TFO Maki will be testifying at trial and will, without a doubt, be asked to explain why and how the recordings were made.  It is up to the jury to assess what the purpose was of the transaction between the CS and Gutierrez; TFO Maki's explication of the same at the outset of the recording places an unnecessary imprimatur of

authenticity to what the recordings are purported to be about in a way which, respectfully, invades the province of the jury as fact-finder.

**B.      Statements of the CS: One-Sided Phone Conversations and his Statements Describing the Same.**

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Davis v. Washington*, 547 U.S. 813, 821 (2005).  In *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the Supreme Court held "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  It is the "testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  *Davis*, 547 U.S. at 821.  Although addressed specifically to statements made in the course of an "interrogation," the following formulation of what constitutes a testimonial statement applies with equal force here inasmuch as the instant statements were made for the purpose of further an investigation: statements are "testimonial when the circumstances objectively indicate that there is no… ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. In sum, it matters not that the jury will hear the statements "live" by through a recording; what matters for Sixth Amendment purposes is: (1) whether the witness is unavailable to testify; (2) whether the defendant had a prior opportunity for cross-examination; and (3) whether they fall within the ambit of "testimonial statements" as elucidated by the Court in *Davis*.

Here, the CS is functionally unavailable as a witness.  His identity has not been disclosed by the government which has steadfastly used the informant privilege to shield the same from discovery.  The defendant, accordingly, has had no opportunity, in these proceedings or in any

other, to cross-examine this witness. The remaining question, then, is whether the statements are testimonial in nature. The defendant respectfully submits both the testimonial nature of the CS's side of conversations in which the other party cannot be heard, as well as the subsequent statements by the CS in which he describes them, are evidenced by the fact that the CS and the UC's vehicle were fitted with recording equipment. In short, there is no doubt these recordings were made with the primary purpose to "establish or prove past events potentially relevant to later criminal prosecution." For this reason alone, this class of the objected-to statements from the transcripts/recordings ought to be excluded.

That these statements directly implicate the Confrontation Clause is further illustrated by the government's apparent basis for admission of other portions of the recordings. For example, the government contends that the portion of the recordings which depict statements made by Gutierrez both inside and outside the garage made to the CS are admissible as non-hearsay statements of a co-conspirator in furtherance of the charged conspiracy; the CS's "side" of these conversations, according to the government, are proffered for "completion" purposes, i.e. to give context and substance to Gutierrez's side of the conversation. The same cannot be said of the CS's side of telephonic communications nor of his explanation of what the other unheard party stated. With respect to those statements, identified above and highlighted throughout Exhibits A & B, the CS's out-of-court, unconfronted, testimonial statements are necessary to complete *both* sides of a phone conversation, or those in which he describes what someone else said/what he observed. In those latter circumstances, the CS's statements are relevant only if offered for the truth and are entirely disconnected from other statements to which a hearsay exception might apply. This is particularly problematic in light of the fact that the other party to whom the CS is allegedly speaking, Miguel Rivera, will not be testifying at trial either. In sum they were made out of court,

6

to further a criminal investigation, were recorded as substitute for in-court testimony, and are replete with statements of a witness who will not be confronted which not only describe his own observations, but also those statements of yet another witness who will not be subject to cross-examination.  As a result, these statements of the CS are not only unconfronted, but constitute textbook totem pole hearsay and are precisely the sort of statements the Confrontation Clause was designed to keep out of criminal trials.

## **CONCLUSION**

Based on the foregoing, the defendant respectfully requests this Honorable Court limit the audio/video recordings from October 4, 2013 to those statements which are not highlighted in Exhibits A and B which are primarily those between the CS and Gutierrez.

Dated:  November 27, 2018

Respectfully submitted,
CARLOS JIMENEZ
By and through his attorneys,


 /s/ R. Bradford Bailey
R. Bradford Bailey, BBO#549749
Adamo Lanza, BBO#689190
BRAD BAILEY LAW, P.C.
44 School Street, Suite 1000B
Boston, Massachusetts 02108
Tel.: (857) 991-1945
Fax: (857) 265-3184
brad@bradbaileylaw.com


## **Certificate of Service**

I, R. Bradford Bailey, hereby certify that on this the 6th day of November, 2018, I caused a true copy of the foregoing motion to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

/s/ R. Bradford Bailey
R. Bradford Bailey, Esq.